[Civ. No. 1819. Fourth Appellate District.—July 14, 1937.]

ETHEL GLADSTONE, Respondent, v. C. E. FORTIER
et al., Appellants.

W. M. Conley, Philip Conley, Matthew Conley and Conley, Conley & Conley for Appellants.

W. H. Stammer and Galen McKnight for Respondent.

JENNINGS, J.—This is an appeal by defendants from a judgment which was entered by the trial court in conformity with a verdict in plaintiff's favor in the sum of $6,500 in an action for damages for personal injuries.

It is conceded by appellants that some evidence was produced during the trial which tended to show that appellant, C. E. Fortier, was guilty of negligence in the operation of an automobile stage on July 13, 1934, and that such negligence was the proximate cause of the collision that then occurred between the stage and an Oldsmobile automobile in which respondent was riding as a passenger and of the personal injuries which she sustained as a result of said collision. Appellants recognize that, in accordance with the familiar rule of appellate procedure which precludes reversal of a

judgment on the ground of evidentiary nonsupport when the record indicates that some evidence in support of the judgment was submitted, the judgment from which this appeal has been taken is not vulnerable to attack on the ground suggested. The contention is not therefore advanced that the verdict lacks evidentiary support. It is, however, insisted that the judgment should be reversed because of certain errors which it is contended were committed by the trial court. These claimed errors may be classified as follows: 1. Improper examination of prospective jurors by respondent's counsel which was permitted by the trial court. 2. Erroneous rulings made by the trial court during the examination of witnesses and in the reception of certain evidence. 3. Incorrect instructions given to the jury by the trial court. It is further contended that the damages awarded by the verdict are excessive and that a reversal of the judgment is demanded for this reason.

With respect to the first of the three above-mentioned groups of claimed errors it is pointed out that during the *voir dire* examination of prospective jurors by respondent's counsel it was clearly intimated that appellants were insured against personal liability which might be imposed as a result of automobile accidents. In this connection it is conceded that respondent's counsel were entitled on such examination to propound to prospective jurors inquiries which in good faith were designed to elicit information indicating whether or not such jurors were interested in any insurance company. It is, however, urged that the privilege thus granted was abused and that appellants were thereby prejudiced.

The particular inquiry which was directed to a prospective juror and to which an objection by appellants was overruled to appellants' prejudice, it is claimed, is as follows: "Have you any interest whatsoever or are you employed by the Pacific Indemnity Company?" This inquiry was preceded by the following question: "Do you own or have you any interest at all in any insurance company writing insurance against personal liability arising out of automobile accidents?" The record shows that questions precisely similar to the above-quoted inquiries had been directed to several prospective jurors without complaint prior to the objection which appellants interposed to the reference to a specific insurance company as constituting prejudicial misconduct. The reiteration of the inquiry which mentioned the Pacific Indemnity Company, although no ob-

jection had theretofore been made to it, is nevertheless relied upon as indicating that the inquiry was not propounded in good faith, but that the plan and purpose of the asking was to instill into the minds of prospective jurors the thought that a corporation engaged in the business of insurance was involved in the action.

The rule is settled in California that it is improper either directly or indirectly to place before the jury any fact which conveys the information that a defendant is insured against loss in the event a recovery of damages should be awarded against him. It is, however, also established that counsel is entitled to ask prospective jurors such questions as may reasonably be necessary to ascertain whether or not they are free from an interest or a bias that may affect their verdict. ''To this end it is proper for counsel, in good faith, to ask of each juror whether he is interested as an agent or stockholder or otherwise in a specified casualty company. Or he may be asked the broad question whether he is interested in any insurance company insuring against liability for negligence. . . . But counsel must take pains to propound such questions in such a manner as not unnecessarily to convey the impression that the defendant is in fact so insured.'' (*Arnold* v. *California Portland Cement Co.,* 41 Cal. App. 420, 425 [183 Pac. 171].)

In the instant action respondent's counsel propounded ''the broad question'' which was designed to elicit information as to whether or not the jurors were interested in or employed by any company which was engaged in the business of writing insurance covering personal liability arising out of automobile accidents. It is not here contended and we think it could not be successfully maintained that the asking of this question constituted prejudicial misconduct. However, as above noted, counsel was not satisfied upon receiving a negative answer to this question but persisted in his investigation with respect to the possible interest of jurors in the matter of liability insurance to the point of asking a question which contained express reference to a specified insurance company. The question which is presented by counsel's action in this regard is whether or not he thereby unnecessarily conveyed to the minds of those persons before whom the action was about to be tried the impression that appellants were in fact insured against liability for damages that might be awarded against them in this action. Serious consideration of this question

impels the conclusion that we may not fairly convict counsel for respondent of bad faith in propounding the above-quoted interrogations. The case of *Arnold* v. *California Portland Cement Co., supra,* is a leading authority on the question now under examination. As above noted, this decision declares that it is entirely proper to ask in good faith a question which is designed to elicit information indicating whether or not a juror is interested in a designated insurance company or to put the broader interrogation covering the possible interest of a juror in any company insuring against liability for negligence. Here counsel asked both questions. A precisely similar situation arose in *Muench* v. *Gerske,* 139 Cal. App. 438 [34 Pac. (2d) 198], and it was there declared that the questions were entirely proper. Certainly the specific inquiry to which alone objection was raised was not improper. (*Arnold* v. *California Portland Cement Co.,* 41 Cal. App. 420 [183 Pac. 171]; *Williamson* v. *Hardy,* 47 Cal. App. 377 [190 Pac. 646]; *Daniel* v. *Asbill,* 97 Cal. App. 731 [276 Pac. 149]; *Hasty* v. *Trevillian,* 102 Cal. App. 405 [283 Pac. 148]; *Levens* v. *Stocco,* 5 Cal. App. (2d) 693 [43 Pac. (2d) 357].)

The second group of errors which it is contended the trial court committed relate to rulings that were made with respect to the admission and rejection of evidence. Three such errors are specified. The first is that during the cross-examination of respondent's witness, Ruth Polsky, the trial court improperly sustained an objection interposed by respondent to the following question: "Isn't it a fact that you know that Miss Marks has brought suit for $10,000.00?" The contention with respect to this ruling is that appellants were entitled to show that this witness was biased and prejudiced and interested in the outcome of this action. Proper understanding of appellants' contention in this regard requires the explanation that it had theretofore been shown that this witness was the driver of the automobile in which respondent was riding when the collision occurred, that Miss Marks was also a passenger in this automobile, and that respondent and Ruth Polsky were cousins and Miss Marks was an aunt of both of them.

In support of their contention that the trial court's ruling sustaining respondent's objection to the above-stated question was prejudicially erroneous, appellants maintain that the state of mind of a witness with respect to his bias

or prejudice, his interest in the outcome of the case in which he testifies, his friendship or hostility toward the parties in the suit are always proper matters for investigation. That such is the rule may be conceded without reference to the authorities which amply warrant its declaration. That the rule was violated by the trial court's ruling of which complaint is here made is not so clear. Presumably it is the contention of appellants that they should have been permitted to show by the witness that she knew that her aunt had instituted a separate action against appellants in which the aunt was seeking to recover damages in the amount of $10,000 for personal injuries sustained in the same accident which formed the basis for the instant action brought by respondent. It is not, however, apparent how the knowledge of the witness as to the institution of such an action by her aunt would tend to show that the witness was biased or interested in the outcome of the present suit to any greater extent than was already apparent from the fact of her relationship to the respondent which was fully disclosed. It is our conclusion that no error was committed by the trial court in sustaining respondent's objection to the above-mentioned inquiry.

The second complaint of rejection of evidence which appellants present is that the trial court erroneously sustained an objection to a question propounded by their counsel to the witness, Frances Marks, on direct examination. As heretofore noted, this witness is an aunt of respondent. Appellants declare that she was present in the courtroom throughout the trial of the instant case and stress the fact that she was not called as a witness by respondent. Whether or not Frances Marks was present during the presentation of respondent's case cannot be discovered from the record. It does appear, however, that she was not called to testify by respondent and that she was called by appellants. During her direct examination she was asked if the Oldsmobile automobile in which she was riding as a passenger at the time the collision occurred was not 20 to 25 feet from a curve in the road at the time when the truck which was being driven by C. E. Fortier first appeared. Respondent objected that the question was leading and the objection was sustained. Appellants protested that they were taken by surprise at a statement of the witness which immediately preceded the asking of the question wherein the witness declared she could not give the exact distance. The protest was based on the

fact that the deposition of this witness which had been taken in advance of the trial showed that she then testified that the Oldsmobile automobile was about 20 to 25 feet from the curve when the truck first appeared proceeding around the curve. Appellants then requested permission to cross-examine the witness with respect to the distance between the curve and the automobile at the time suggested. Upon objection by respondent that such proposed cross-examination of their own witness would be improper the court refused permission. Appellants then offered to prove that the witness had testified during the taking of her deposition that the automobile in which she was riding was about 20 to 25 feet from the curve immediately prior to the happening of the accident as a foundation for their application to be permitted to cross-examine the witness with respect to the disputed matter of distance. The court nevertheless persisted in its former ruling and declined to allow the witness to be cross-examined as proposed.

The basis of appellants' complaint to the rulings of the court in this regard is that the witness was obviously hostile to appellants and they were therefore entitled to the widest latitude in their examination of her for the laudable purpose of discovering the truth with respect to a matter upon which the evidence theretofore submitted was sharply conflicting. We perceive no error in the rulings of the court to which objection is here made. The objection that the question which suggested the distance between the curve and the automobile was leading was well taken and was properly sustained. (Code Civ. Proc., sec. 2046.) With respect to the trial court's refusal to permit appellants to cross-examine the witness, it is evident that this procedure was sought for the purpose of impeachment. While section 2049 of the Code of Civil Procedure permits impeachment of a witness by the party who produces him by showing that, at other times, he has made statements inconsistent with his present testimony, it is also provided that the impeachment must be accomplished in the manner described in section 2052 of the same code. We deem it a sufficient answer to appellants' contention in this regard to point to the fact that the proposed impeachment of the witness did not follow the method provided by the last-mentioned statute. ██ Furthermore, the privilege of impeaching a witness by the party who calls him is subject to the limitation that the present testimony of

the witness must be such that it occasions surprise to the party and that the surprise must not only be substantial but it must be founded on the fact that the testimony of the witness is not only at variance with what the party had reason to believe it would be but that it is also prejudicial or detrimental to the case of such party. (*Agalianos* v. *American Central Ins. Co.*, 62 Cal. App. 349, 360 [217 Pac. 107]; *Whitelaw* v. *Whitelaw*, 122 Cal. App. 260, 264 [9 Pac. (2d) 874].)

When the proposal to cross-examine for the purpose of impeachment is considered with reference to the testimony which the witness gave and to the contents of her deposition in the light of the foregoing limitation it is apparent that no error was committed by the trial court's refusal to permit the cross-examination. The witness testified that she could not state the distance between the curve and the automobile in which she was riding. Thereupon counsel for appellants protested that this testimony took him by surprise and later offered to show that the witness, when she gave her deposition, had stated that the distance was about 20 to 25 feet. However, in the very portion of the deposition which was offered in proof, the witness in response to an inquiry as to how far the Oldsmobile automobile was from the curve said that she did not know and that she was a poor judge of distance and later upon counsel's repetition of the inquiry stated that she "imagined" it was about 20 or 25 feet. In the face of this testimony, which clearly indicated that the witness was most uncertain as to the distance and that the figures which she gave were no more than a guess, it is inconceivable that counsel could have experienced surprise so substantial as to justify an effort to impeach the witness upon her declaration that she really could not state the exact distance.

The third complaint relative to the production of evidence which appellants make is that the trial court, after the witness C. E. Fortier had been impeached, by reading to him extracts from his deposition which contained statements contradictory to the testimony which he gave during the trial and inquiring if he had not so testified, then erroneously permitted respondent's counsel to reread such extracts as an admission against interest of this witness who was a party defendant in the action. It is pointed out that appellants objected to the rereading of the deposition on the ground that it had already been placed in evidence for all

purposes in the effort to impeach the witness and that such rereading would constitute misconduct prejudicial to appellants. By this procedure which appellants characterize as peculiar, curious, and awkward, it is maintained that an undue and unnecessary emphasis of certain testimony which appeared in the deposition was thereby accomplished which was highly prejudicial to appellants. In support of their contention appellants cite numerous authorities wherein the refusal of trial courts to allow such procedure to be followed has been approved. It is, however, obvious that the cited cases are of no assistance in arriving at a proper solution of the present problem since they go no further than to announce approval of rulings refusing the repetition of evidence. Here it is contended that a ruling permitting repetition is so prejudicial as to demand reversal. While we are not disposed to grant unqualified approval to the trial court's action, we are equally unprepared to declare that error so substantial as to require reversal was thereby committed. Necessarily wide discretion is vested in the trial court with respect to the admission and rejection of evidence and our examination of the record has failed to produce a conviction that appellants were so seriously prejudiced by the court's ruling that it must be declared that an abuse of discretion was thereby consummated.

 ■ ˙Appellants further complain of a number of instructions which were given by the court to the jury. These instructions are criticized because it is declared they contain incorrect statements of legal principles. Certain of these instructions pertain to the feature of damages. For a reason which will later become apparent no consideration will here be given to instructions bearing on the question of damages. With respect to the remaining criticized instructions, it is sufficient to state that examination of all instructions given by the court impels the conclusion that the jury was fairly advised as to the legal principles applicable to the facts. Although it must be conceded that some of the instructions are not strictly accurate and are therefore subject to the criticism which appellants urge we are nevertheless unable to agree that the giving of them constituted error so prejudicial as to render a reversal of the judgment necessary. We are the more constrained to this conclusion because we are unable to agree with the repeated declaration of appellants that the case was so close that the giving of

some of the instructions which are vulnerable to the attack made upon them effected a miscarriage of justice. That the evidence upon the question of appellants' liability was conflicting must be conceded. That there was ample evidence which indicated that appellant, C. E. Fortier, was guilty of negligence in the operation of the truck which he was driving and that his negligence in this regard was the proximate cause of the collision and of the consequent personal injuries suffered by respondent is likewise manifest. On this state of the record and considering the instructions as a whole, we are unable to declare that the giving of isolated instructions fairly subject to criticism caused a miscarriage of justice.

 Upon the matter of instructions it is further urged that the trial court committed error prejudicial to appellants in refusing to give a certain instruction which was requested by appellants. The instruction which was thus offered and refused reads as follows:

"You are instructed that if you believe from the evidence that the statement of any witness who has testified here is contrary to the physical facts, you may disregard such evidence so far as the same is contradicted by the physical facts."

It is a sufficient answer to the contention here advanced to point to the fact that among the instructions which the trial court gave there is one wherein the court advised the jury that it was not bound to believe the testimony of any witness unless such testimony imported verity and established conviction in the minds of the jurors nor was the jury obligated to decide in conformity with the declarations of any number of witnesses which did not produce conviction in the minds of the jurors as against a lesser number or against a presumption or other evidence which was satisfactory to the minds of the jurors. This instruction also contained the admonition that the presumption that a witness speaks the truth may be repelled by various specified and familiar factors including the presence of "any other fact or circumstance elicited during the trial which may aid you in determining as to whether the witness has spoken the truth". It is our opinion that the instruction which the court gave properly impressed upon the jury its broad power of determining the credibility of witnesses and that it was sufficiently extensive to include the more limited reference to possible contradiction of oral testimony by physical facts

which was contained in the proffered instruction. We conclude therefore that no error was committed by the court's refusal to give the quoted instruction.

The final contention which is presented on this appeal is that the damages awarded by the verdict are excessive. Proper consideration of this contention requires detailed reference to the evidence regarding the personal injuries which were suffered by respondent in the accident and the results which it was indicated would be reasonably certain to follow from such injuries.

The evidence on this feature of the case showed that as a result of the collision respondent suffered a contused two-inch laceration over the right frontal parietal area of the skull, a two-inch laceration over the anterior surface of the right knee, and a strain of the muscles of the right shoulder. After the collision respondent was conveyed directly to a hospital in the city of Fresno, where she received medical attention. The lacerations were sutured and dressed. Upon the conclusion of this treatment respondent was permitted to leave the hospital and she thereupon went to a hotel in Fresno where she remained for one week before she returned to her home in San Francisco. During the time respondent remained at the Fresno hotel she called at the office of the physician who had first treated her on three different occasions on each of which her wounds were dressed. On the occasion of her third visit to the doctor's office which was six days after the collision occurred the sutures were removed and the wounds had apparently healed without infection. After respondent returned to San Francisco she consulted her family physician who examined her on July 24, 1934. The testimony of this witness showed that he discovered the two lacerations which he said were then in process of healing and that he diagnosed the injury to the right shoulder as a slight swelling of the right shoulder in comparison to the left shoulder with pain on abduction and rotation of the upper right arm. The patient was very nervous at this time and exhibited symptoms of considerable psychic and nervous shock. The treatment prescribed consisted of sedatives, hot applications to the shoulder, the right arm to be supported in a sling, and rest in bed for a period of six weeks. The prescribed treatment was followed. During this period the physician called upon her a number of times and found that the scalp wound which at first was

sensitive to touch responded to treatment and became less sensitive. The patient, however, complained of severe headaches during this period. This witness testified that he examined respondent 10 days before the trial commenced at which time the wound on the right knee had completely and normally healed with no reasonably certain ill effects to be anticipated therefrom in the future. The examination made at the later date disclosed that there was only slight discomfort in the right shoulder resulting from complete abduction. As to reasonably certain results that might be expected to occur in the future from this injury, the witness expressed the opinion that it was reasonable to assume pain would be felt for an indefinite period during cold weather or exposure or from certain unexplained "violent muscular movements of the arm in certain positions". The witness further stated that at the time of the later examination he found that the scalp wound had healed normally and that there was no evidence of inflammation or tenderness. The witness testified that the patient complained of insomnia, sleeplessness, and intermittent headaches of varying degrees of intensity, all of which she said she had suffered after the occurrence of the accident on July 13, 1934. The witness expressed the opinion with respect to the head injury that she had suffered a cerebral concussion in addition to the scalp laceration and that the results which would be reasonably certain to follow from the concussion would be intermittent headaches, susceptibility to fatigue and other possibilities which he declared were impossible to foretell. With respect to the feature of respondent's personal injuries and the unfortunate results therefrom which may be expected to appear in the future the most damaging evidence to appellants which was produced consisted of the testimony of a physician in the city of Fresno who stated that he made two examinations of the respondent on the day preceding that on which he testified for the express purpose of giving testimony relative to the injuries. A lengthy and involved hypothetical question was directed to this witness by respondent's counsel. The inquiry purported to state correctly the material facts surrounding the collision, particular description of the head injury sustained by respondent and her recollection of what occurred after the occurrence of the accident, a history of medical treatments which were administered to her including the six-week rest period at her

home and the various subjective and objective symptoms consisting of severe headaches, nervousness, susceptibility to fatigue, insomnia, and inability to relax. On the basis of the facts thus stated the witness was asked to diagnose the injuries which respondent suffered. An objection by appellants to the question on the ground it did not fully and correctly set forth the facts as developed by the evidence was overruled. The witness then replied that in his opinion respondent had received a blow on the head sufficiently severe to cause concussion of the brain and a hemorrhagic scalp laceration which caused dizziness, disturbance in vision and in hearing, insomnia and apprehension. The witness was then asked to state what results, in his opinion, would be reasonably certain to follow from the brain concussion. An objection on the ground of lack of proper foundation was overruled and the witness testified that respondent would be reasonably certain to suffer chronic headaches, disturbances of vision and stability and "some obsessions, perhaps". The witness further testified that the brain concussion suffered by respondent was, in his opinion, severe. He also testified that from the examinations which he had himself made as distinguished from the facts supplied by the hypothetical question, he had discovered that respondent was extremely nervous, "that is to say she was trembly" and that her eyes were jerky. He then related a number of purely subjective symptoms which he testified were related to him by respondent. The witness admitted that the only objective symptoms which he found consisted of tremor, some difficulty in standing and a spasm of the eye muscles which caused a jerking. From these objective symptoms and more especially from the subjective symptoms which were disclosed to him during his examinations, the witness testified that the headaches from which respondent suffered would undoubtedly "get worse", that if the optic nerve had been damaged the vision would be permanently damaged and if the concussion had affected the mentality the patient might become demented. With reference to the respondent's mentality having been affected the witness testified that there was some evidence that such was the case and on being asked what it was he replied as follows: "This obsession that she—her career has been ruined, she has been permanently damaged mentally." The witness finally declared that it was impossible to determine positively what the final results of

the head injury would be but that certain results had then appeared which results were headaches, obsession, vertigo, and disturbance of vision. With respect to the optic nerve having been damaged the witness stated on cross-examination that he was unable visually to detect that the optic nerve had been damaged when he made an examination of the patient's eyes with the aid of an instrument known as an ophthalmoscope and that respondent related to him no history of having ever used spectacles, or having consulted an oculist or an optometrist. He did state that he discovered a jerking of the eyeballs "which could have come from an injury". The witness further specified certain other objective symptoms which he had noted consisting of inability to stand well with the eyes closed, inability to find the nose with the finger tips, the eyes being closed, and inability to find the finger tips with the eyes closed. He admitted that these last-mentioned symptoms are not necessarily indicative of brain concussion and that they may be found in diseases having no connection with concussion. The doctor further testified that reflexes of the pupil of the eye were normal as were also the knee jerks. The witness made the interesting and—to a layman in medicine—the peculiar remark that the fact that respondent had stated to him that she was not rendered unconscious by the collision had great weight with him in arriving at the conclusion that she was actually unconscious.

The respondent herself testified as to the injuries she received in the collision, the pain which she suffered as a result of her injuries particularly the scalp wound which she stated was sensitive for months and from which she suffered pain in her head and shooting pains in the scar. She further testified that she experienced pain in her right shoulder when the weather changed and when she raised her right arm to an upright position, that she continued to have headaches, which she admitted were not as constant as they had been at first, that she became fatigued more easily, that she suffered from insomnia and still had to take sedatives to induce sleep, that she found it difficult to concentrate and that she was much more nervous than she had been prior to the accident. She also testified that prior to the date of the collision she had been employed as a Latin translator in the medical school of the University of California at a salary of approximately $50 per month and that as a result of the injuries which she sustained she was unable to fill this position

for the period of one year. It was shown that respondent had incurred expenses for the services of physicians, medicine, hospitalization, and X-rays which amounted to $110.

The above-narrated facts constitute a fair *résumé* of the evidence relating to respondent's injuries and the reasonably certain results which might be expected to ensue therefrom from the point of view most favorable to respondent. The problem now presented is whether or not it may fairly be declared that an award of $6,500 therefor is so disproportionate to the extent of damage suffered as to suggest as a matter of law that the jury was influenced by considerations of passion and prejudice in arriving at the amount specified in the verdict. ■ It must be borne in mind in giving consideration to this problem that one of the grounds specified in appellants' motion for a new trial was that the award was excessive, that the judge who presided during the trial and who had the opportunity to hear the testimony first hand and to observe the demeanor of the witnesses who testified including respondent was thus given the opportunity of reviewing the award, and that it must be assumed that he felt the sum awarded by the jury was not excessive. Nevertheless, in spite of this factor which deserves consideration, the final responsibility of determining whether or not the award is excessive rests with the reviewing court where the contention of excessiveness is presented as one of the chief reasons for reversal of the judgment.

■ There is no absolute rule established for determining whether or not a verdict is excessive (*Morgan* v. *Southern Pac. Co.*, 95 Cal. 501 [30 Pac. 601]) and an award may not be declared to be excessive as a matter of law simply because the amount is larger than is generally allowed in cases which are factually similar. (*James* v. *Oakland Traction Co.*, 10 Cal. App. 785 [103 Pac. 1082].) The only means of measuring a verdict for the purpose of discovering whether or not it was influenced by passion or prejudice is by comparing the amount awarded with the evidence submitted to the trial court since a declaration that the verdict was influenced by passion or prejudice is but another way of stating that the verdict exceeds any amount justified by the evidence. (*Zibbell* v. *Southern Pac. Co.*, 160 Cal. 237, 254 [116 Pac. 513]; *Barrett* v. *Harman,* 115 Cal. App. 283, 288 [1 Pac. (2d) 458].)

In analyzing the heretofore mentioned evidence bearing on the question of respondent's injuries, and the after-effects which may be reasonably certain to follow therefrom we feel bound to declare that there was some evidence which indicated that respondent suffered a concussion of the brain as a result of the collision. We are also constrained to declare that because of the injury to her head she experienced headaches of varying intensity from July 13, 1934, until the date of the trial in February, 1936, but that the severity of such headaches had gradually diminished. We are also bound to declare, since there is evidence to this effect, that it is reasonably certain that she will continue to suffer from headaches of some uncertain severity for some uncertain period in the future. We must also declare that as a result of her injuries respondent has become more susceptible to fatigue, finds more difficulty in mental concentration, has become and will be reasonably certain to continue to be more nervous and apprehensive than she was prior to the accident. We are not however impelled to declare that respondent's vision has been or will be reasonably certain to be seriously impaired as a result of the head injury which she sustained. Nor do we find from the evidence that there is any reasonable likelihood of respondent becoming demented. We presume that we must concede that as a result of the accident respondent became obsessed with an idea that her career had been ruined by her injuries since there is some evidence to this effect.

From all this we are led to the conclusion that the personal injuries which respondent sustained in the collision were not extensive, that her wounds healed normally in a reasonable length of time, that she suffered some pain because of them, that she was thereby rendered more nervous and apprehensive than she was prior to the accident, that she suffered headaches which showed progressive improvement and in the natural course of events may be expected with reasonable certainty to decrease in intensity but that it is not reasonably certain that she will suffer either serious impairment of vision or that she will become demented in the future as a result of her injuries. Arrival at this conclusion prompts a declaration that the amount awarded by the jury exceeded any amount which the evidence fairly justified. In our opinion the sum of $4,000 is the maximum amount which,

under the circumstances here presented, may be permitted to stand.

Appellants have urged that certain affidavits submitted by them on the motion for a new trial are properly part of the record on appeal and may be considered by this court in reviewing the trial court's action in refusing to grant a new trial. Respondent maintains that such affidavits are not properly part of the record and should not be considered on this appeal. As we view this feature of the case it is a matter of no material importance. The affidavits have been included in the reporter's transcript as were also counter affidavits filed by respondent in opposition to the motion. Both sets of affidavits have therefore been examined and except as to the matter of damages we find no reason to disturb the trial court's denial of a new trial which was based on conflicting evidence.

It is ordered that in the event the respondent, within thirty days from and after the filing of this opinion, shall file with the clerk of this court her written consent to a modification of the judgment in her favor by deduction from the amount therein specified of the sum of $2,500, leaving the same to stand in the amount of $4,000 and costs of suit, said judgment shall be modified accordingly and as so modified shall be affirmed. In the event said consent for modification be not filed within the time designated, the judgment shall be reversed. If the respondent within the time designated files her written consent to modification of the judgment as herein provided she shall recover her costs on appeal.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 9, 1937.